**FILED**
**JULY 12, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Marriage of | ) | No. 37813-6-III |
| | ) | |
| SARAH L. ANDREWS, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| STEVEN C. ANDREWS, | ) | |
| | ) | |
| Respondent. | ) | |

LAWRENCE-BERREY, A.C.J. — Sarah Andrews, now Sarah Stevens, appeals the

trial court's denial of her motion to modify a parenting plan. Her central contentions are

the trial court failed to enter a finding whether her former husband committed abuse or

neglect and remand for a finding is required. Alternatively, she argues if the trial court

found she had not met her burden of proof on her contention, insufficient evidence

supports that and reversal is required.

We conclude the trial court found that Ms. Stevens had not proved by a

preponderance of evidence that her former husband committed abuse or neglect and

substantial evidence supports this finding.  We decline to award attorney fees on appeal

and affirm.

## FACTS

Sarah Stevens and Steven Andrews were divorced in 2007.  At the time, they had

three children together, T., born in 2002, W., born in 2003, and F., born in 2005.[1]  Since

their divorce, they have continued to litigate various aspects of their parental

responsibilities.  F. is now the only minor child subject to the parenting plan.

### *2009 parenting plan modification*

Shortly after their divorce, Ms. Stevens and Mr. Andrews agreed to amend their

parenting plan.  Then, in November 2007, Ms. Stevens and Mr. Andrews cross-petitioned

for modification of the parenting plan.  The court found adequate cause had been

established for Ms. Stevens's modification, but not for Mr. Andrews.  The court entered

its final order modifying the parenting plan in April 2009.

The court found that the parties' conduct and behavior when exchanging the

children was concerning.  It found that "the children were being exposed in far greater

---

[1] To protect the privacy interests of minor children, we identify them through the use of initials. General Order of Division Three, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

degree to the conflicts of the parents than was in their best interests." Clerk's Papers (CP) at 29. Rather than protecting the children, the parents were "utilizing these children as instruments of their own priorities." CP at 30. The court further found that the original parenting plan's division of residential time, in which Mr. Andrews had primary residential placement of T. and Ms. Stevens had primary residential placement of W. and F., was not in the siblings' best interests, as the numerous transfers between the parents were a continual problem.

The court found that Mr. Andrews used conflict abusively by recording and surveilling Ms. Stevens. The court found Mr. Andrews's early litigation activities were sanctionable for intransigence, but that as the matter progressed that was no longer an issue. The court ordered restrictions under RCW 26.09.191(3) for Mr. Andrews's abusive use of conflict. It declined, however, to order restrictions under RCW 26.09.191(1) and (2) for emotional abuse. The court ordered all three children would have the same residential schedule—alternating weekends with Mr. Andrews. It gave Ms. Stevens sole decision-making for educational decisions, nonemergency health care, and religious upbringing based on its abusive use of conflict finding for Mr. Andrews.

The court ordered both parents to engage in counseling going forward. The court also included a unilateral attorney fee provision in Ms. Stevens's favor:

> The father shall pay all of the mother's attorney fees and costs for defending any motion, show cause, or modification of parenting plan action brought by the father, which is unsuccessful, found to be frivolous, or is found to be an abusive use of conflict or in efforts to exert control. The father will pay all of the mother's fees and costs for any successful action necessarily brought by the mother to address father's actions.

CP at 26.

### *2010 appeal and commissioner's ruling*

Mr. Andrews appealed, arguing the court erred by granting Ms. Stevens's request to modify the parenting plan, including a restriction that limits his involvement in decision making, and awarding attorney fees based on intransigence. A commissioner of this court affirmed after we moved on the merits under RAP 18.14. Comm'r's Ruling, *In re Marriage of Andrews*, No. 28091-8-III (Wash. Ct. App. Oct. 13, 2010) (the "2010 commissioner's ruling"). The commissioner found there was substantial evidence in the record of Mr. Andrews's abusive use of conflict that supported the modification and the restrictions. The commissioner noted that T. "made several alarming statements to [his counselor], including telling her that Mr. Andrews told him to lie about physical abuse from Ms. [Stevens's] parents, and that, if he did not say that Ms. [Stevens's] parents were abusing him, he would never get to see Mr. Andrews again." CP at 64.

The commissioner also discussed Mr. Andrews's behavior at exchanges and incidents where he followed and recorded Ms. Stevens and her parents. The

4

commissioner acknowledged the trial court found concerning behavior from both parties, but noted the court's findings and the record showed "Mr. Andrews was the major source of conflict." CP at 67. The commissioner found that Mr. Andrews's "obstructionist" behavior beyond the trial supported the award of attorney fees for intransigence. CP at 70.

### 2014 modification petition

In 2014, Mr. Andrews petitioned to modify the parenting plan for all three children because T. was integrated into his household. The court found there was adequate cause to modify for T., but not the other children. The court temporarily modified T.'s residential schedule to reflect the status quo but denied Mr. Andrews's request for joint decision making and appointment of a guardian ad litem (GAL). The court awarded fees to Ms. Stevens under the 2009 parenting plan to the extent they were related to Mr. Andrews's unsuccessful modification petition for W. and F.

From the record, it appears Mr. Andrews abandoned the modification after adequate cause was found and the temporary order remained in place; there are no final orders on the modification in the record.

*2017 modification petition*

On December 7, 2017, Ms. Stevens petitioned to modify the parenting plan for all three children because they reported mental and physical abuse by Mr. Andrews, which was being investigated by Child Protective Services (CPS). She requested the court further limit Mr. Andrews's parenting time and participation and adjust the provisions of the 2009 parenting plan regarding dispute resolution, decision making, and transportation arrangements. She requested a protection order and a restraining order against Mr. Andrews.

*Ms. Stevens's support for modification*

Ms. Stevens's declaration stated that at the end of October, Mr. Andrews had taken F. to a well-child exam and orchestrated a false allegation against Ms. Stevens for giving F. unprescribed pills, which resulted in the doctor making a CPS complaint. Ms. Stevens said that she had been trying to avoid litigation but decided her approach needed to change on November 14, the date CPS contacted her. She asked the two younger children about what was happening at Mr. Andrews's house and they described incidents of physical and verbal abuse. Ms. Stevens also stated that T. did not want to go back to Mr. Andrews's house and, when Ms. Stevens informed Mr. Andrews that T. would not go to Mr. Andrews's house at the scheduled exchange time, Mr. Andrews called the police.

Ms. Stevens also included declarations from the children's counselor, who had been seeing the children for two years. The counselor stated that the children were afraid of their father and were reporting physical and emotional abuse. The counselor stated that between November 18 and 27, all three children had described incidents of abuse by their father from the previous several years.

Ms. Stevens included a declaration from T., who was then 15 years old, stating he did not want to live with or spend time with his father. T. stated he wanted his own lawyer to make sure the judge would know what he wanted. He stated he did not "want to get in the middle of drama between my mom and dad." CP at 158. He mentioned it would not be good for W. or F. to spend time with Mr. Andrews because Mr. Andrews was causing a fight about F.'s use of medication. He did not mention any mental or physical abuse by his father. T. retained a lawyer, paid for in part by Ms. Stevens and in part by a loan from Ms. Stevens's father.

### Mr. Andrews's response

Mr. Andrews moved for an order to enforce the existing parenting plan. He denied the reported abuse and claimed Ms. Stevens had a history of reactionary behavior when concerns were raised about her care of the children. He stated the children's schools had discussed issues with Ms. Stevens and her response had always been to change the

7

children's school. T. and W., who was then 14 years old, had changed schools eight times, and F., who was then 12 years old, had changed schools nine times. He contended Ms. Stevens also unilaterally changed the children's counselors whenever the counselor said something she did not like, in violation of a court order that the parties select a counselor together. He argued that Ms. Stevens's decision to hire an attorney for T. made it impossible to shield T. from the litigation.

Mr. Andrews included a declaration from T.'s teacher for sixth and eighth grades. The teacher described Mr. Andrews's "constant support" of T. that was "integral" to T.'s success in school. CP at 241.

Mr. Andrews also included a declaration from F.'s doctor.[2] The doctor was the primary pediatrician for both T. and F. The doctor stated that Mr. Andrews had been her primary contact and she had never seen any concerning interactions to lead her to believe the children feared their father. The doctor described receiving an angry phone call from

---

[2] Ms. Stevens indicated at trial that the declaration had been struck and apparently provided the transcript of a hearing in which this happened. There is no evidence that the declaration was struck in our record and the court's rulings on contemporaneous evidentiary objections do not address the doctor's declaration.

Ms. Stevens on November 15 about the doctor's CPS report.[3] The doctor indicated F. had told her that Ms. Stevens had given F. pills that made F. dizzy and forgetful. Ms. Stevens told the doctor that she had given F. some of her old attention-deficit/hyperactivity disorder medication to help her study. The doctor indicated F.'s prescription had expired and was for a medication that was designed to be given in the morning.

*Adequate cause*

On December 28, 2017, the court entered an order restraining contact between Mr. Andrews and the children and suspending his residential time. It ordered that visits must be supervised "in a therapeutic family setting once the children's current counselor recommends a family therapist." CP at 602.[4] The court noted that the family therapist would need to have contact with both parents. The court also ordered that a GAL should be appointed. The parties agreed to continue the adequate cause hearing to January 25,

---

[3] The relevant CPS report does not include information about the referrer, but the information is consistent with it coming from F.'s doctor, stating that the referrer "considers father primary as he brings child to all medical appointments." Sealed Clerk's Papers at 992. The CPS report was resolved through a family assessment response.

[4] The court's written order is handwritten by Ms. Stevens's counsel and is not completely legible. Regarding the counselor, it appears to read: "Any visits must be therapeutic at recommendation of [the children's current counselor] & new family therapist recommended by [the children's current counselor] to occur at least 1x per week." CP at 442.

2018, at which time the court would also review the order and address visitation with a counselor if there had not been a recommendation.

The children's counselor recommended Dr. Lisa Christian for therapeutic visitations, but Mr. Andrews objected. The adequate cause hearing was struck so the parties could mediate, but they were unable to resolve their disagreement. Mr. Andrews wanted to enter an agreed order on adequate cause and move forward to a trial on the merits. Ms. Stevens did not want to enter an agreed adequate cause order because it could impact her ability to receive attorney fees under the 2009 parenting plan. The court eventually held a hearing on adequate cause on May 10, 2018.

The court found there was adequate cause to proceed to trial. The court additionally found that there were allegations of abusive use of conflict and that there were existing limitations in the 2009 parenting plan due to abusive use of conflict. It also found there were allegations the father had physically and emotionally abused the children that collectively formed the basis for adequate cause. It found that Mr. Andrews denied the allegations and that the truth of the allegations was for the trial court to decide. It ordered that the prior orders against Mr. Andrews would remain in effect.

The court also ordered the appointment of a GAL for the children. The parties agreed on who should serve as GAL, but could not come to an agreement on the language

to be used regarding the GAL's fees.  Ultimately, the court appointed a GAL for the children on August 24, 2018.

GAL's motion regarding counseling

On January 23, 2019, the GAL filed a motion asking that a counselor be chosen and court ordered.  She noted that the children still had no contact with Mr. Andrews and while T. did not want to participate in therapy with Mr. Andrews, W. was open to it, and F. was eager to begin.  She noted that the parties seemed to have trouble finding an appropriate provider, a problem she shared as many counselors did not want to be involved in a case in litigation or provide therapy for multiple children.

Mr. Andrews filed a declaration in support of the motion indicating he would like to start counseling right away and that Ms. Stevens had rejected all of his suggested counselors.  Ms. Stevens would not accept any counselor other than Dr. Lisa Christian, who had been recommended by the children's counselor sometime between March and May 2018.  She stated that she would not agree to any counselor Mr. Andrews had previously met with.  She argued that Mr. Andrews had not provided any reasoning why he did not agree with using Dr. Christian and that he therefore could not object.

Mr. Andrews responded that he objected to Dr. Christian because when he spoke with her, she was "very, very negative" and had a "short on time attitude."  CP at 1565.

11

He indicated he did not think therapy would work if he did not feel at ease with the therapist. He noted the child psychologist from the parties' 2009 trial had recommended three counselors and that he had spoken with one of them with whom he felt very comfortable. He expressed his belief that Ms. Stevens was pushing for Dr. Christian because she knew the counseling would not happen if Dr. Christian was the only person allowed to do the counseling.

The court heard the motion on May 14, 2019. The GAL described her difficulty finding a counselor and proposed Cortney Rasley, with whom the GAL had worked on a previous contentious case.

Mr. Andrews noted that Ms. Stevens was objecting to any counselor he had previously spoken with except Dr. Christian, although Mr. Andrews had also spoken with her. Mr. Andrews reiterated he was not comfortable with Dr. Christian and noted that his comfort with the therapist would be important to successful counseling. He was open to the GAL's suggestion.

Ms. Stevens argued that Mr. Andrews had not moved to revise, reconsider, or appeal the children's counselor's selection of Dr. Christian and so it was the law of the

case.[5] She argued that Mr. Andrews's dislike of Dr. Christian was an insufficient reason

not to have therapy with her.

Mr. Andrews replied that the court's order allowed the children's counselor to

recommend a family counselor, but it did not require that the recommended counselor

would be the only counselor the court could appoint. He argued that the recommendation

had never been converted into a court order appointing Dr. Christian.

The court asked Ms. Stevens whether she objected to the other proposed

counselors on any grounds "except for that they aren't Dr. Christian." Report of

Proceedings (RP) (May 14, 2019) at 60. Ms. Stevens responded that she did not know

any of the other counselors and thus objected to them all.

The court ruled:

> [I]t's going to be in the children's best interest to start therapy with dad, I
> don't know why people have dug in for sixteen months. That's probably
> not in the children's best interest for either party. But here we are.
>     So I am going to select Cortney Rasley at the recommendation of
> [the GAL] as somebody who we know can take this case on, and get it
> moving forward.

RP (May 14, 2019) at 60-61.

---

[5] We note that the counselor's selection of Dr. Christian was never filed with the court, merely "communicated to counsel" for Mr. Andrews, and accordingly could not have been revised, reconsidered, or appealed. CP at 699.

*Reunification and recantation*

Counseling with Ms. Rasley began in June 2019.  After a few months, Mr. Andrews began seeing the children unsupervised before their weekly session.  In March and April 2020, during the first months of the COVID-19 pandemic, W. and F. lived exclusively with Mr. Andrews while Ms. Stevens's husband was working with COVID patients.  The children then began staying with Mr. Andrews on alternating weekends.  Ms. Stevens reported to the GAL that the children were in a good place emotionally and liked Mr. Andrews's fiancée.  Ms. Stevens also indicated that if anything happened, they could talk to Ms. Rasley.

The parties attempted mediation on May 20, 2020, which failed.  Trial on the modification was scheduled for June 15, 2020.

On May 27, 2020, W. called the GAL, telling her he needed to clear something up.  He was on speakerphone with F. present in the background, who sometimes commented but was not entirely audible.  W. told the GAL

> that there was a video that had been made some time ago in which all three children had said a few things and those things were not accurate as his mother had told them what to say.  He told [the GAL] that there was so much talk about his dad in his mother's home that he started to believe it.

14

Ex. R-104, at 1. W. explained that some of the allegations of abuse were completely untrue and some were partially untrue. He said that the things T. said happened either did not happen or were T.'s fault.

W. told the GAL he felt pressure to say the things he did because his mother would say things over and over at her house. He described her going over things the children needed to say to the GAL before their meetings. He also indicated she was using or accessing his e-mail without permission.

W. said he wanted his mother to "just drop all of this and be done." *Id.* at 2. He told the GAL the "court stuff" had been going on his entire life and he just wanted it to stop. *Id.* He could tell that things were "'ramping up'" in the court case and had learned a lot of wrong things had been said. *Id.* at 3. He said he had talked to Mr. Andrews and the family therapist about this, but would not talk about it with Ms. Stevens because it would not go well.

F. said she had heard everything W. said and agreed with it. W. sent the GAL an e-mail the same day with more detail about what they had discussed; the e-mail was signed by both W. and F.

The GAL spoke with Ms. Rasley, who confirmed that the children had told her similar things in therapy. Ms. Rasley was not sure about the change in what the children

15

were saying, but thought it was possible they were seeing things differently as they got older. She said that based on what she had seen in therapy, she had no concerns about the children being with their father.

Ms. Stevens told the GAL she was shocked by the children's new statements. She said she never would have chosen to go through lengthy litigation and that it all began because the children were talking about what went on with their father and wanted her help. She admitted making a video, but said it depicted things the children were saying of their own accord, not things she had told them to say. She indicated that W. wanted to take over Mr. Andrews's business someday and was concerned Mr. Andrews could lose the business if the court found abuse. Ms. Stevens was not sure why F. would change her story but said that F. had recently told her that Mr. Andrews was trying to get her to change her story.

The GAL spoke with T., who had not participated in therapy or spent time with Mr. Andrews since the modification began. T. recalled his mother making a video, but his mother did not tell them what to say, just helped them organize their thoughts. T. said that Mr. Andrews "would hit him or smack him, usually one time, but did not beat him up." Sealed Clerk's Papers (SCP) at 1946. He said Mr. Andrews harmed W. as well so W.'s statement that it did not happen was not true. T. stated what he had previously

16

reported was true and he was not sure why W. would say it was not. He stated that maybe

W. and F. now believed these things had not happened, but that they did. He said that Mr.

Andrews was a bad influence who tried to paint Ms. Stevens as "some kind of evil

mastermind." SCP at 1946.

### *Pretrial attorney fee award*

On May 26, 2020, Ms. Stevens moved for an award of attorney fees and costs to

continue to pursue her modification action at trial, basing her request on the 2009

parenting plan's attorney fee provision that Mr. Andrews would pay all of Ms. Stevens's

fees and costs for bringing a successful action.

On June 5, the court heard the motion and ordered Mr. Andrews to pay Ms.

Stevens $10,000 of attorney fees. The court stated that it normally reserved fee awards

for trial, but thought there was enough to award fees based on Ms. Stevens succeeding in

getting adequate cause granted.

### *Trial*

By the time trial began on June 15, 2020, T. had turned 18 years old and was no

longer subject to residential time provisions of the parenting plan.

*GAL testimony*

The GAL testified at length about her contacts with the children. She did not ask W. if he was lying when he recanted the abuse allegations because he was a child and she did not believe it was appropriate to put him on the spot. She had asked W. why she was hearing something now that was different than what he had said before. W. told her that when he was younger, someone may have told him what to say. The GAL testified that

> he said the most important thing included that his dad was innocent and the question of when this was going to end. That was really a continuing theme with [W.], when is this going to end, this needs to end. I think he was the one talking about that he felt like he was an arms dealer and his parents were two warring countries and so he wants this to end.

RP (June 15, 2020) at 87. W.'s desire to have things done resonated with the GAL, and he seemed "tired of talking to therapists and just wants to be a kid." RP (June 15, 2020) at 96.

The GAL recommended that the parties return to the 2009 parenting plan. She said that Ms. Rasley, who had worked with and seen the children the most, indicated "they are in a good place. They really want to spend time with their parents and time with their dad, and I don't see that it's in their best interest to have limitations on that." RP (June 15, 2020) at 101-02. She noted the children were teenagers, not toddlers, and recommended

18

that both parties be so, so careful in what they talk about with these kids and around them. They're bright kids. If you're talking in another room I guarantee that they're listening, and, you know, I say that in a lot of my cases, and it's kind of trite, but just to try to let them just be teens. It's hard enough.

RP (June 15, 2020) at 102.

The GAL testified she understood that Ms. Stevens did not object to the residential portion of the 2009 parenting plan. She generally thought it was in the children's best interest to have joint decision making, but that the court history indicated to her that Mr. Andrews and Ms. Stevens "don't make decisions well" together. RP (June 15, 2020) at 103.

The GAL had "no knowledge" that Mr. Andrews was abusing the children at the time of trial and was not concerned about abuse in the future. RP (June 15, 2020) at 124. She noted,

Certainly I have concerns, based on what the kids have said in the past, I think I have to. But I also am in a situation that I have kids that are 15 and 16 that have a therapist that they trust that if something did happen, I feel confident that they would say something and that they would be safe.

RP (June 15, 2020) at 125.

The GAL had served in over 1,000 cases, and "had kids that I believed were absolutely coached for a number of reasons." RP (June 15, 2020) at 127. She testified that she did not know whether the children were being coached in this case. She was

19

concerned "because it was such, I guess an about-face for them that that is, I guess, uncommon in cases where I have the kind of kids that are mostly saying about the same things throughout a case, . . . and then all of a sudden, just do an about-face." RP (June 15, 2020) at 200. She disagreed that the recantation was suspicious, however, because there was nothing from which to say the abuse happened in the first place. She had found the children believable when she talked to them in the past. She was not sure if she found W. believable when he recanted and described him as "really wanting this over" and believing his statement would help things be over. RP (June 15, 2020) at 218.

The GAL described the video Ms. Stevens took of W. and F. The video was taken November 14, 2017, prior to the children meeting with their counselor Ray Hopkins. Ms. Stevens said in the video the purpose was "[t]o get the facts down from the kids' mouth[s] for the lady who is coming to the home in a couple of weeks." RP (June 15, 2020) at 133. It was approximately 35 minutes long and featured Ms. Stevens asking the children open-ended questions. The GAL testified that in her experience courts are generally not pleased with parents videotaping their children in family law proceedings. She noted that while as GAL she was not in the place of making recommendations, as an attorney she would not have recommended a client make such a video.

The GAL described her investigation for the case, including pulling CPS and police reports and interviewing people who had spent time with Mr. Andrews and the children. She testified that to her knowledge the only allegations of abuse in the case came from T., W., and F. at the beginning of the case.

The court questioned the GAL after her testimony, noting the case had been ongoing since 2017, "The process, based upon the initial allegations, has worked, has it not, at least from your perspective?" RP (June 15, 2020) at 222. The GAL answered, "I think it has from where I'm sitting now versus where I was sitting at the beginning of this case, yes." RP (June 15, 2020) at 222.

*Ms. Stevens's testimony*

Ms. Stevens explained that she took the video of the children because she wanted to memorialize their conversation and did not think much of doing so because using phones is so common. She could not explain why she had held onto the video for more than two years, but said she "didn't think about it." RP (June 16, 2020) at 367. She had not told anyone about it except possibly her parents and current husband. Ms. Stevens stated that she did not want to be in court again but believed it was necessary to protect the children after they described abuse to her.

21

She described the difficulty choosing a counselor, "Lisa Christian was first, and then that was a no, and then it just Mr. Andrews objected, and so it just kind of stalled." RP (June 16, 2020) at 271. Once the counseling began, she had no concerns: "I was very happy to whatever, whatever you guys think, as long as the kids are okay with it, as long as the counselor's recommending it. Why not?" RP (June 16, 2020) at 273.

Ms. Stevens acknowledged that the issues that spurred the modification had been addressed and that the children were once again seeing their father and there was no indication they were being abused. She agreed about going back to the 2009 parenting plan. Ms. Stevens noted that she had "a good feeling" about the children being at Mr. Andrews's home because the children were "older, they have cell phones, the GAL is involved, there's a counselor involved, [Mr. Andrews's fiancée] is there." RP (June 16, 2020) at 285-86.

Despite being comfortable with the status quo, Ms. Stevens expressed concern that the children were "learning to lie" to make life easier. RP (June 16, 2020) at 284. She asked the court to enter findings that Mr. Andrews engaged in abusive use of conflict and in physical and emotional abuse. She said that it was important to recognize the children's experiences and the difficulty of coming forward to seek protection. She

22

testified that she had hoped not to get to trial at all because she did not want a finding of abuse on his record, but she wanted to validate the children's experiences.

### *Mr. Andrews's testimony*

Mr. Andrews had worked as a nurse and eventually opened two adult family homes. He testified that he could not legally run the homes if he had a finding of domestic violence or child abuse against him.

Mr. Andrews testified that T. had primarily lived with him from 2012 until 2017. He described T.'s attitude beginning to change in September or October 2017. Mr. Andrews and T. had several conversations about T. spending more time at Ms. Stevens's house, but T. never gave the impression he no longer wanted to live with Mr. Andrews. One week after F.'s doctor made a CPS report, T. refused to go back to Mr. Andrews's house.

Mr. Andrews testified that he had attempted to negotiate a counselor other than Dr. Christian because he had heard from other professionals that she was not very ethical and "just not a straight-shooter." RP (June 16, 2020) at 440. He recalled asking his attorney to make changes, but Ms. Stevens would not agree to any other suggestions. He said that after a lot of back and forth, the GAL had been helpful in getting the parties to agree to Ms. Rasley.

23

Mr. Andrews admitted he had "made a lot of mistakes" in the 2009 modification but could not recall all the details of the court's findings. RP (June 17, 2020) at 517.

### *Court's comments after trial*

After closing arguments, the court took the matter under advisement. The court emphasized that it would be looking at evidence regarding the current petition forward, which did not necessarily include Mr. Andrews's conduct from before the 2009 parenting plan was entered.

The court questioned why the parties were still in court:

> [W]hat are we accomplishing with this? Why are we here? And by "here", I mean trial. . . . I don't know why this didn't resolve at mediation, but based upon where we are today, for purposes of what benefits these children, it should have. That's my position with regards to this.

RP (June 17, 2020) at 557-58. The court opined that while trial generally resulted in a winner and a loser, its decision would result in both parties losing. The court noted that if it made a finding of abuse and Mr. Andrews lost his business, Ms. Stevens would lose her source of child support, the children could lose their home, Ms. Stevens would lose the ability to pay attorney fees, and possibly more repercussions. On the other hand, if the court did *not* make a finding of abuse, it would potentially damage the children and cause them to disbelieve their mother's ability to protect them.

The court noted that there had certainly been cause to initiate the modification, but that reunification had been accomplished and everyone agreed that was a good thing. The court expressed concern that its "decision is potentially going to blow that up, and I don't want to blow it up. I want these kids to be done. You're looking at a lifetime of litigation here. How horrific is that for your kids?" RP (June 17, 2020) at 559. The court opined: "Courts don't fix family problems. . . . [W]e put a Band-Aid on them and hope you two fix your family problems. We don't have the capacity to fix family problems. I cannot fix this." RP (June 17, 2020) at 559.

The court said it was unsure what decision it would make and expressed hope that before it issued its decision, the parties could "sit down and figure this out for the children because I can guarantee you, my decision will not help them through this . . . . That's what parents are for." RP (June 17, 2020) at 560. The court encouraged the parties to "get out of your positions and come back to what's good for your children." RP (June 17, 2020) at 561.

### Court's ruling on modification

The parties did not come to an agreement, and the court delivered its oral ruling on August 12, 2020. The court discussed the history of the case and highlighted the attorney fee provision in the 2009 parenting plan, noting it was an "attorney's fees clause, in

essence, for the prevailing party, if you are talking contract law." RP (Aug. 12, 2020) at

7-8.

The court discussed the children's differing testimony:

What was apparent from trial is that the children presented concerns about their abuse from their father to begin with. They did then step through the therapeutic process, ending up with contacts that were outside that therapeutic process, and eventually living with him for two months. At the end of the two month time with dad and weekends resuming is when their stories changed. That story change was supposed to, I suppose, be an ah-ha or gotcha moment. I'm not sure that this Court would describe it as such. But that about-face did take the guardian ad litem by surprise.

During the June of 2020 coming forth with this changed information, the guardian ad litem also learned that at the beginning of this matter Ms. Stevens had videotaped or recorded the children on her cell phone, recorded their statements. That was the first that [the GAL] had learned of this. In June of 2020 she learns that this video recording occurred in approximately November of 2017. No one had told her, no one had told a counselor, no one had indicated anything to the Court that this was done until right before trial.

[T.] . . . and, I believe, [W.] had testified that their mother would remind them of things that they should say during counseling or also direct them how to gather their thoughts for preparation for these things. Again, as I indicated, the guardian ad litem cannot testify as to whether the original story was coached by mom or whether the story, final story was coached by dad. It's not really her role here. It does become very difficult to make that determination.

Ms. Rasley is not a forensic counselor. She was not in the position of making those kinds of determinations and was not tasked with determining the truth. A lot of times in court proceedings the parties think the truth will come out, we will get to the bottom of this.

Well, unfortunately, that's not really what we're about when you come to court for family law matters. It's what we'd like to know because it assists the court in making determinations. But ferreting out the truth and

determining who's telling the truth, who's lying, who's making things up or fudging borders is not what anybody has the ability to do. Until we get some new wave technology for lie detectors that you have on during testimony, I'm not sure we'll ever get there.

I will also, for purposes of this record, indicate that the guardian ad litem certainly cannot tell whether any type of videotaping by cell phone caused the children to make up the allegations that they made against their father or give any insight as to whether the mother helped the children with their statements.

RP (Aug. 12, 2020) at 14-16. The court noted the GAL had not seen any abusive use of conflict by Mr. Andrews in the current case nor any evidence of coaching and that there had been no founded findings of abuse by CPS against either parent.

The court expressed concern that T. was involved in the litigation after turning 18,

[W]hile I don't have any jurisdiction over [T.], the concern I have is that he was put right back where he was, right in the middle of the conflict. The children shouldn't be involved in the conflict but they are. Unfortunately, they've been there since 2006, 2007 at the latest.

RP (Aug. 12, 2020) at 21. The court noted that conflict between the parents was a theme throughout the case and that it could not see why that was, "other than the personalities of the parties that are parenting these children. That needs to get fixed before these children ostraci[z]e both parents." RP (Aug. 12, 2020) at 21.

The court discussed the statutory requirements for a parenting plan modification, noting that Ms. Stevens's petition was based on RCW 26.09.260(2)(c), but that at the time of trial she was no longer requesting a change of residential time in the parenting plan.

27

The court declined to make Ms. Stevens's requested finding of abusive use of conflict by Mr. Andrews, finding that the acts in the current modification were "nothing like the acts described in 2009, which warranted the finding of abusive use of conflict by both the trial court and the [C]ourt of [A]ppeal[s]." RP (Aug. 12, 2020) at 21.

The court discussed Ms. Stevens's requested finding of abuse, noting that to make a finding it would have "to be able to determine at what stage in the process the children were lying, for lack of a better term." RP (Aug. 12, 2020) at 22. It noted that the GAL had been unable to assist the court in making the determination and that the court could not make that determination either with secondhand information. The court noted that Ms. Stevens made light of the recording of the children and did not appear to understand its significance.

The court explained that while the GAL had been unable to determine whether the children were being coached or which version of events was correct,

> what she did indicate is that it is apparent to her the children are in conflict. I agree with that. That stands out loudly. They have been dealing with their parents' conflict for a very long time. They may not have been aware of that conflict when they were younger, but I can guarantee you they have been aware of this conflict for quite some time. And if both parents don't think that conflict affects their children, neither is thinking as a parent, you are thinking with some other motive, I suppose.

28

RP (Aug. 12, 2020) at 22-23. The court noted it did not have a crystal ball and that it was being asked to find a very serious allegation. It explained that the burden of proof was just a preponderance of the evidence, but that the "case is not so black and white as it appears to be for the parties." RP (Aug. 12, 2020) at 23. The court declined to make "a finding of abuse under the circumstances." RP (Aug. 12, 2020) at 23.

The court noted it had reviewed *In re Marriage of Ambrose*, 67 Wn. App. 103, 834 P.2d 101 (1992), which held that "where the time between hearings [was] lengthy, the need to look at current circumstances of both parents is compelling." RP (Aug. 12, 2020) at 23. The court summarized, "In other words, the court is not to just rely on the facts that were in evidence at the time of the petition, the court also looks at the facts at the time of trial." RP (Aug. 12, 2020) at 24. The court noted that Mr. Andrews did not have contact with the children for 18 months, but once they started therapeutic counseling,

> [t]he issues in the father's home were addressed and the children were back and comfortable spending time with their father. That is where we are at the time of trial. It's as if we came full circle. What was, no longer existed. I was here determining what to do with this case, when we were right back where we started from. Which is why I was asking the question of the parties as I was[:] Why are we here?

RP (Aug. 12, 2020) at 24.

The court expressed concern over the delay in beginning counseling, noting that neither parent brought a motion to appoint a counselor, "The only people that delay

benefited was the mother and potentially the father. It certainly in no way benefited these children, not at all, not in my perspective." RP (Aug. 12, 2020) at 25. The court noted that Ms. Stevens filed the petition for modification and then did not follow through, "You don't just get to drop the bomb and then stand back and say I'm out of it. That is, at least from my perspective, not what a parent does. The follow-through in this case was for the benefit of the children . . . ." RP (Aug. 12, 2020) at 25. The court noted the GAL's testimony that F. and W. wanted to start counseling and opined, "I cannot imagine that this wasn't apparent to Ms. Stevens, the children's need to see their father. Again, coming back to the length of delay here, this really is baffling to me." RP (Aug. 12, 2020) at 26.

The court noted that without a finding of abusive use of conflict or abuse, it could not modify the decree unless it found there had been a substantial change in circumstances to the children. It considered the circumstances at the time of the petition through the time of trial and ruled:

> I do not find that the children's present environment with their father, visiting with their father is detrimental to their physical, mental, or emotional health. That was not demonstrated at trial. The guardian ad litem, in fact, indicated that detriment didn't exist at the time of trial. Neither mom nor dad provided any different information to the Court or evidence to the Court.

RP (Aug. 12, 2020) at 26. The court concluded:

30

> The only finding I can make is that these children are now back in a good place and they want court to be over and done with. I do not find that it is in their best interests to modify the parenting plan or to make a finding of abuse against the father; therefore, I'm not going to be doing that.

RP (Aug. 12, 2020) at 27. The court acknowledged that there could have been a different result had the case not taken so long to resolve.

The court denied the modification and ordered that the 2009 parenting plan would remain in full force and effect, with no additions or deletions of the existing restrictions under RCW 26.09.191. It ordered each party to pay its own attorney fees because Ms. Stevens had not been successful in obtaining a finding of abuse and ordered the return of the $10,000 Mr. Andrews had paid.

Ms. Stevens timely appeals. During the pendency of this appeal, W. turned 18 years old; F. is now the only child subject to the parenting plan.

## ANALYSIS

A. COMPLETENESS OF THE TRIAL COURT'S FINDINGS

Ms. Stevens contends the court's ruling was incomplete and it must be reversed. Ms. Stevens specifically points to the court's failure to enter findings of abuse or abusive use of conflict under RCW 26.09.191, arguing that the court simply chose not to come to a conclusion on those issues. We disagree.

"The absence of a finding of fact in favor of the party with the burden of proof about a disputed issue is the equivalent of a finding against that party on that issue." *Wallace Real Estate Inv., Inc. v. Groves*, 72 Wn. App. 759, 773 n.9, 868 P.2d 149, *aff'd*, 124 Wn.2d 881, 881 P.2d 1010 (1994). Ms. Stevens had the burden to show that abuse or abusive use of conflict occurred. *See In re Welfare of B.R.S.H.*, 141 Wn. App. 39, 48, 19 P.3d 40 (2007) ("Under Washington statutes, the burden in a modification hearing is clearly on the moving party . . . .") (citing RCW 26.09.260(1), (2)). Thus, the absence of a finding of abuse or abusive use of conflict is the equivalent of a finding there was no abuse or abusive use of conflict that formed a basis to modify the parenting plan.

In the absence of new restrictions under RCW 26.09.191, the required findings for denying a parenting plan modification are minimal. To modify the parenting plan, the court must find "that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child." RCW 26.09.260(1). Therefore, to deny modification, the court need only find that there has not been a substantial change in circumstances *or* that the modification is not in the best interests of the child. Ms. Stevens argued that there had been a substantial change in circumstances in that Mr. Andrews created an environment that was detrimental to the children under

32

RCW 26.09.260(2)(c). The court found there was no detriment proved at trial. It found

that modification would not be in the children's best interests. Therefore, there was no

basis to modify the parenting plan. The court's findings were complete.

B.   SUFFICIENCY OF EVIDENCE TO SUPPORT NO FINDING OF PHYSICAL AND
     EMOTIONAL ABUSE

Ms. Stevens contends the trial court erred in finding there was no abuse or

detriment to the children. We disagree.

We review the trial court's rulings on children's welfare for abuse of discretion. *In

re Marriage of Horner*, 151 Wn.2d 884, 893, 93 P.3d 124 (2004). A trial court abuses its

discretion if its decision is manifestly unreasonable or based on untenable grounds or

reasons. *Id.*

> A court's decision is manifestly unreasonable if it is outside the
> range of acceptable choices, given the facts and the applicable legal
> standard; it is based on untenable grounds if the factual findings are
> unsupported by the record; it is based on untenable reasons if it is based on
> an incorrect standard or the facts do not meet the requirements of the
> correct standard.

*In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). A trial court's

discretion in parenting plans is guided by statute. *In re Marriage of Chandola*, 180

Wn.2d 632, 642, 327 P.3d 644 (2014).

33

*Application of* In re Marriage of Ambrose

Ms. Stevens contends the trial court misread *Ambrose* and erroneously focused on the children's environment at the time of trial instead of reviewing all relevant evidence.

In *Ambrose*, the noncustodial father filed a petition to modify the parenting plan after the custodial mother was incarcerated. 67 Wn. App. at 104. The court modified the decree, finding that the mother's present environment at the time of the petition for modification was detrimental to the children. *Id.* at 105. Division Two of this court reversed and remanded, concluding that "child's present environment" as used in RCW 26.09.260(2)(c) refers to the environment at the time the trial court is considering the matter. *Id.* at 107. The court further concluded that the "statutory term requires a court to consider all relevant evidence about the custodial parent's performance as a parent, before it modifies a prior custody decree or parenting plan." *Id.* at 108. It noted that it was "for the trier of fact to determine the relative weight of such evidence." *Id.*

The trial court did not misread *Ambrose*. It correctly summarized:

> The trial court must consider any and all relevant evidence from the time
> the children were removed from a residence as well as circumstances at or
> about the time of trial. In other words, the court is not to just rely on the
> facts that were in evidence at the time of the petition, the court also looks at
> the facts at the time of trial.

RP (Aug. 12, 2020) at 23-24. In delivering its ruling, the court explicitly noted it was "[t]aking into consideration the circumstances of the children at the time of the petition, as well as at the time of trial . . . ." RP (Aug. 12, 2020) at 26. It did not solely focus on the time of trial, as Ms. Stevens contends. There was no error.

> ### *Avoidance of abuse findings*

Ms. Stevens asserts that restrictions under RCW 26.09.191 "must be made." Br. of Appellant at 56. She cites *In re Parenting and Support of L.H.*, 198 Wn. App. 190, 194-95, 391 P.3d 490 (2016), in which the trial court recognized a history of domestic violence, including police reports, an assault conviction, and a protection order, ordered domestic violence treatment, but erroneously declined to enter a finding of domestic violence because of the collateral consequences. *L.H.* is inapposite. Here, there was equivocal evidence of abuse from which the court found there was no basis for restrictions under RCW 26.09.191; it did not simply decline to make findings because of the consequences of those findings.

Ms. Stevens points to the court's comments encouraging mediation as evidence that the court wanted to avoid the collateral consequences of an abuse finding against Mr. Andrews. Ms. Stevens misreads these comments—they do not reveal any desire on the court's part to avoid the abuse finding. The court opined that both parties would "lose"

no matter which way it ruled and objectively explained the possible negative

consequences of a ruling in either party's favor. After discussing the ramifications of

finding abuse, it discussed the ramifications of *not* finding abuse and expressed no

preference either way. The court's only expressed opinion was its concern that its

decision would create more upheaval for the children and that it "want[ed] these kids to

be done." RP (June 17, 2020) at 559.

### *Substantial evidence of no abuse*

The bulk of Ms. Stevens's argument boils down to a request that we reweigh the

conflicting evidence and find abuse. That is not the role of an appellate court. *See Lewis*

*v. Dep't of Licensing*, 157 Wn.2d 446, 468, 139 P.3d 1078 (2006). Instead, we look to

whether there was substantial evidence "sufficient to persuade a fair minded person of the

truth of the declared premise." *Id.*

Here, the parties presented two scenarios to the court. In Mr. Andrews's account,

Ms. Stevens coached the children to allege the abuse in retaliation for F.'s doctor making

a CPS report against Ms. Stevens. This was supported by the timing of the allegations

after Ms. Stevens learned of the CPS report, Ms. Stevens's actions of recording the

children and failing to disclose that fact to the GAL or the court, the GAL's inability to

detect signs of coaching in the recantation, and Ms. Rasley's opinion that the children

may just be seeing things differently as they got older.  In Ms. Stevens's account, Mr.

Andrews coached the children to recant the abuse allegations after they spent two months

living with him.  This was supported by Mr. Andrews's history of coaching, the GAL's

testimony the children were believable when telling their initial account and the

children's consistency, and the court finding Ms. Stevens credible.[6]

We conclude that there was substantial evidence supporting the court's finding that

Ms. Stevens had not met her burden to show abuse had occurred.  Ms. Stevens had the

burden of proving abuse by a preponderance of the evidence, and the truth was uncertain.

A fair-minded person could accept Mr. Andrews's evidence.  That a fair-minded person

could also accept Ms. Stevens's evidence is not grounds to reverse the trial court on

appeal.

### *Miscellaneous errors*

Ms. Stevens contends the trial court erred by relying on the GAL's testimony that

the children were older and able to report any abuse in the household.  Ms. Stevens seems

to forget that this was her own testimony at trial as well.  She expressed no concerns

---

[6] Ms. Stevens also discusses at length the fact that W. and F. recanted their allegations after spending time with Mr. Andrews while T. maintained the original account of events.  While this could be consistent with Mr. Andrews coaching the children while they were in his care, it is also precisely the result one would expect if Ms. Stevens was the parent coaching the children.

about the children being at Mr. Andrews's house and testified that they were older, had

cell phones, and a support system in place. It was not error for the court to rely on

uncontroverted evidence.

Ms. Stevens includes a number of assignments of error that are not addressed in

the argument section of her brief. "We do not consider assignments of error unsupported

by argument or authority." *In re Marriage of Angelo*, 142 Wn. App. 622, 628 n.3, 175

P.3d 1096 (2008). We similarly do not address the numerous errors Ms. Stevens raises in

footnotes throughout her argument. *See State v. Johnson*, 69 Wn. App. 189, 194 n.4,

847 P.2d 960 (1993) ("[P]lacing an argument of this nature in a footnote is, at best,

ambiguous or equivocal as to whether the issue is truly intended to be part of the

appeal.").

      C.      SUFFICIENCY OF EVIDENCE TO SUPPORT NO FINDING OF ABUSIVE USE OF
                   CONFLICT

Ms. Stevens contends the trial court erred by not finding abusive use of conflict in

this proceeding. We disagree.

*ER 404(b) propensity evidence*

Ms. Stevens first contends the court limited the past evidence of Mr. Andrews's

abusive use of conflict under ER 404(b). While there was no discussion of ER 404(b) at

trial, Ms. Stevens cites an exchange at trial when her counsel questioned Mr. Andrews

about the contents of the 2010 commissioner's ruling.  After Mr. Andrews testified he did

not remember the content of the ruling, counsel indicated she would read the ruling to Mr.

Andrews.  Mr. Andrews's counsel objected and the court sustained the objection:

> [Mr. Andrews's counsel]:  I am going to object to this because if he doesn't know what's in the opinion, he can't testify to it.
> [Ms. Stevens's counsel]:  Well, let me say it this way—
> THE COURT:  So I'm going to sustain the objection.  I'm going to have you ask questions, and I would like to get you to this action, not that one.
> [Ms. Stevens's counsel]:  I understand.
> THE COURT:  And you also understand, I can't make findings based upon past behavior for this petition.  Right?
> [Ms. Stevens's counsel]:  Yes.
> THE COURT:  Okay.

RP (June 17, 2020) at 518.

There was no error in the court's ruling.  Mr. Andrews had established there was

no foundation for Ms. Stevens's line of questioning regarding the contents of the ruling.

*See* ER 602 (a witness may not testify to a matter of which they have no personal

knowledge).  The ruling had nothing to do with ER 404(b).  Further, the court correctly

noted that in a modification proceeding, it was making its findings based on "facts that

have arisen since the prior decree or plan," not the facts contained in the commissioner's

ruling.  *See* RCW 26.09.260(1).  Thus, the line of questioning was not relevant to the

39

current proceeding and was properly excluded. *See* ER 402 (irrelevant evidence is not admissible).

Ms. Stevens's argument about ER 404(b) is therefore an argument newly raised on appeal, which we generally decline to review. *See* RAP 2.5(a). Ms. Stevens presents no argument on why we should consider this alleged error for the first time on appeal, and we decline to do so.

### *Substantial evidence of no new abusive use of conflict*

Ms. Stevens also asserts that the court failed to consider circumstantial evidence of abusive use of conflict. She points to no evidence of this except the court's adverse ruling; instead, she appears to be asking this court to reweigh the evidence considered by the trial court and come to a different conclusion. Again, this is not the role of an appellate court. Instead, we look to whether substantial evidence supported the court's finding. *Lewis*, 157 Wn.2d at 468.

As an initial matter, by declining to modify the 2009 parenting plan, the court left in place the finding that Mr. Andrews used conflict abusively and its attendant restrictions, which the court explicitly noted in its ruling: "I'm not adding, nor deleting any of the [RCW 26.09].191 restrictions that are currently in [the 2009 parenting plan]." RP (Aug. 12, 2020) at 28.

Because Ms. Stevens sought to modify a parenting plan that already had a finding of abusive use of conflict, to modify the parenting plan on that same basis, she had to show there was abusive use of conflict since the prior parenting plan that constituted a "substantial change of circumstances." RCW 26.09.260(1). Ms. Stevens points to Mr. Andrews's delay in beginning counseling, his alleged coaching, and the motions he filed during the modification. The court found, however, that the conduct Ms. Stevens alleged was abusive use of conflict in the present modification was "nothing like the acts described in 2009." RP (Aug. 12, 2020) at 21.

Substantial evidence supports the court's determination that there was not abusive use of conflict that supported a modification of the parenting plan. In the prior case, Mr. Andrews extensively surveilled Ms. Stevens and her parents, coached T. to allege abuse by Ms. Stevens's father, and was an obstructionist pretrial. Here, Mr. Andrews delayed counseling because he was not comfortable with the recommended counselor and Ms. Stevens refused to consider another counselor. Considering Mr. Andrews would be participating in the counseling, it seems reasonable to insist on a counselor with whom he felt comfortable discussing difficult issues. And as the court noted, while Mr. Andrews did not move to resolve the counseling issue, neither did Ms. Stevens. Furthermore, the court did not find Mr. Andrews coached the children nor was there evidence of

41

surveillance of the type in the prior proceeding.[7]  There was substantial evidence

supporting the court's finding that Mr. Andrews did not use conflict abusively such that it

constituted a substantial change in circumstances.

>    *Miscellaneous errors*

Ms. Stevens argues the trial court failed to properly apply the 2010 commissioner's

ruling.  We disagree.  The trial court noted that the findings from that appeal were not

binding and that "Mr. Andrews can be the greatest problem in a case back in 2009, that is

not necessarily evidence for me to make a decision on today."  RP (June 17, 2020) at 557.

As discussed above, the abusive use of conflict finding from 2009 was left in place when

the court declined to modify the parenting plan.  The court correctly noted that Mr.

Andrews's behavior could change since 2009 and that the fact he acted one way then was

not controlling of his actions in the future or the court's findings at trial.  There was no

error.

Ms. Stevens argues the court improperly delegated its responsibility to determine

credibility to the GAL, while at the same time arguing it was error for the court to hold

---

[7] Ms. Stevens alleged that Mr. Andrews had once recorded her at a counseling
appointment with the children and testified he held his phone up over the steering wheel
of his car as she walked by.  Mr. Andrews denied recording her.  There was no further
allegation or evidence of surveillance.

that the GAL could not determine the children's credibility. In addition to being

contradictory, this argument again asks us to reweigh the evidence. This is not our role.

D.    ATTORNEY FEES BELOW

Ms. Stevens contends the trial court erred by not awarding fees. We disagree.

The trial court has the discretion to award attorney fees in a dissolution action. *In*

*re Marriage of Foley*, 84 Wn. App. 839, 846, 930 P.2d 929 (1997). We address each of

Ms. Stevens's asserted bases for attorney fees in turn.

*Parenting plan*

Ms. Stevens first requested attorney fees under the 2009 parenting plan, which

provides Mr. Andrews will pay fees for any successful action Ms. Stevens brings or

unsuccessful action he brings.

First, Ms. Stevens asserts that the court initially awarded fees because of Mr.

Andrews's unsuccessful motions before trial. This is not supported by the record. In

awarding pretrial fees, the court explained its reasoning:

> The Court normally reserves it for trial, but considering all the filings
> from the beginning when this was filed in '17 to now, I think there should
> be lawsuit funds granted at this point.
>    . . . .
>    . . . I think there's enough with all the filings that she was successful
> in getting adequate cause granted and setting it all up.

RP (June 5, 2020) at 5-6. While the court discussed "all the filings" including Mr. Andrews's unsuccessful motions, it explicitly awarded fees based on Ms. Stevens's success until that point, not Mr. Andrews's lack of success.

The trial court reversed the fee award after it declined to modify the parenting plan, finding Ms. Stevens had not been successful within the meaning of the parenting plan. Ms. Stevens contends that was error because she was entitled to fees for Mr. Andrews's unsuccessful pretrial litigation. In her trial brief, however, Ms. Stevens only requested fees under the parenting plan for her successful action. She did not request fees based on Mr. Andrews's unsuccessful motions. The court did not abuse its discretion by failing to award relief that was never requested.

Ms. Stevens contends she *was* successful despite the fact the trial court found there were no grounds to modify the parenting plan, arguing that the outcome of having the children reunify with Mr. Andrews shows her action was a success. The parenting plan did not provide fees for successful parenting outcomes; it provided them for successful

actions.[8] "American jurisprudence defines 'action' as 'a judicial proceeding in which one asserts a right or seeks redress for a wrong.'" *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*, 146 Wn.2d 29, 40-41, 42 P.3d 1265 (2002) (quoting 1 AM. JUR. 2D *Actions* § 4, at 725-26 (1994)). Ms. Stevens's judicial proceeding was not successful and she therefore did not have a successful action justifying fees under the parenting plan. The court did not abuse its discretion by not awarding fees to Ms. Stevens.

### RCW 26.09.140

Under RCW 26.09.140, "[t]he court *from time to time* after considering the financial resources of both parties *may* order a party to pay" reasonable costs and attorney fees. (Emphasis added.) As the plain language of the statute indicates, the award "'rests with the sound discretion of the trial court . . . .'" *In re Marriage of Buchanan*, 150 Wn.

---

[8] We note that this provision is not in the best interests of the children in this case. Ms. Stevens explicitly stated she would not enter an agreed order of adequate cause because she wanted to recover attorney fees under the 2009 parenting plan. We suspect that the answer to the trial court's question of "Why are we here?" is similar: so that Ms. Stevens could obtain a favorable court ruling and recover her attorney fees. The children consistently and repeatedly told the GAL that they wanted this action to be over, and the court found that "these children are now back in a good place and they want court to be over and done with." RP (Aug. 12, 2020) at 27. Yet the attorney fee provision incentivized further harmful litigation. While the provision does not authorize fees in the circumstances of this case, we nonetheless question the enforceability of a provision that runs counter to Washington's public policy of protecting children.

App. 730, 739, 207 P.3d 478 (2009) (quoting *Kruger v. Kruger*, 37 Wn. App. 329, 333, 679 P.2d 961 (1984)).

Ms. Stevens requested fees under RCW 26.09.140, baldly asserting that "equitable principles" supported an attorney fee award. Ms. Stevens did not argue what those equitable principles were or provide any further justification for an award of fees under the statute. On appeal, Ms. Stevens points out that Mr. Andrews has a greater income— her percentage of support is 42.3 percent while Mr. Andrews's percentage is 57.7 percent. This is not a large disparity in incomes and the court did not abuse its discretion in declining to award fees under RCW 26.09.140, especially given Ms. Stevens's lack of argument on the issue.

### *Intransigence*

Ms. Stevens contends fees were appropriate based on Mr. Andrews's intransigence during the modification proceeding. Courts may award attorney fees based on the equitable ground of intransigence, which may include foot dragging and obstruction, repeated unnecessary motions, or making trial unduly difficult and costly. *In re Marriage of Greenlee*, 65 Wn. App. 703, 708, 829 P.2d 1120 (1992).

Ms. Stevens argued in her trial brief that fees were appropriate for intransigence because Mr. Andrews delayed counseling and had a history of abusive use of conflict. As

discussed above, the trial court found that Mr. Andrews's past abusive use of conflict did not necessarily indicate he was using conflict abusively in this action. It also noted that Ms. Stevens had failed to move counseling forward either, noting that Ms. Stevens could not just "drop the bomb and then stand back and say I'm out of it" and finding that the delay "certainly in no way benefited these children." RP (Aug. 12, 2020) at 25. The court found that "[b]oth parents' actions have gotten us to this point, which includes the continued conflicts, the length of time this action took, and the fact that this conflict is not hidden from these children." RP (Aug. 12, 2020) at 27. These findings are supported by the record.

Indeed, the record shows that Ms. Stevens is far from blameless for making trial unduly difficult and costly. For example, when Mr. Andrews proposed entering an agreed adequate cause order, Ms. Stevens refused because it could imperil her chance to receive attorney fees under the 2009 parenting plan. The delay between Ms. Stevens's petition to modify the parenting plan and the eventual hearing on adequate cause was more than six months. We conclude that the trial court did not err by declining Ms. Stevens's request for award fees.

E.     ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal. We decline to award fees to either party.

*Ms. Stevens's request*

Ms. Stevens requests fees on appeal for the same reasons she requested fees below—under the provisions of the 2009 parenting plan, under RCW 26.09.140, and for intransigence below.

We decline to award attorney fees to Ms. Stevens under the parenting plan because she was not successful in her appeal under the standards set forth above.

We decline to award fees under RCW 26.09.140 because such an award is discretionary, and we view the appeal as improvidently filed. It is evident from the trial court's extensive oral ruling that it determined Ms. Stevens had not met her burden of proof. It also is evident that substantial evidence supported the ruling and that we would not overturn it on appeal.

We decline to award fees based on intransigence because Ms. Stevens does not allege delay on Mr. Andrews's part in this appeal, only in the trial court and, as discussed above, that did not form a basis for attorney fees.

Ms. Stevens points to our 2010 decision to award fees based in part on Mr. Andrews's intransigence in the trial court. Those fees were awarded under RCW 26.09.140 as part of the consideration of the parties' financial resources and the merit of the issues raised in that appeal. We did not award fees solely based on Mr. Andrews's intransigence below.

### *Mr. Andrews's request*

Mr. Andrews in turn requests fees on appeal for Ms. Stevens's intransigence. He argues Ms. Stevens has dragged him and their children through endless litigation. He points out that during the course of this modification and appeal, two of the three children have reached adulthood. Mr. Andrews's arguments have some merit. If we were convinced he was innocent in the latest drama that sparked endless litigation, we would agree. As was the trial court, we are in equipoise. For this reason we decline Mr. Andrews's request for attorney fees on appeal.

No. 37813-6-III
*In re Marriage of Andrews*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____       _____
Fearing, J.                                                    Pennell, J.